Filed 8/6/13  P. v. Vigeant CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B241378 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA075960) |
| v. | |
| ANTHONY VIGEANT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mark C. Kim, Judge.  Affirmed.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Anthony Vigeant appeals from the trial court's denial of his motions requesting a new trial, the striking of the special circumstance, and the appointment of an expert. In July 2009, Vigeant was convicted of the first degree murder of David Pettigrew with special circumstances (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17))[1] (count 1), attempted robbery (§§ 664/211) (count 2), and first degree burglary (§ 459) (count 3). The jury found that a principal was armed with a firearm during the commission of all counts. (§§ 12022, subd. (a)(1).) After denial of the new trial motion and other motions, the trial court sentenced Vigeant to life in prison without the possibility of parole (LWOP) in count 1, a consecutive term of four years six months in count 2, and an additional year for the principal-armed enhancement. The court stayed the sentence in count 3 under section 654.

Vigeant appeals on the grounds that: (1) the trial court prejudicially erred in denying his motion for new trial, requiring reversal; (2) the trial court abused its discretion by refusing to hold an evidentiary hearing and to appoint a clinical neuropsychologist, and the errors prejudicially denied Vigeant his constitutional rights; (3) Vigeant's LWOP sentence constitutes cruel and unusual punishment; and (4) the sentence in count 2 must be stayed under section 654.

## FACTUAL HISTORY[2]

At Vigeant's trial, Ramon Hernandez testified that he was a charged codefendant in the shooting death of Pettigrew. He had pleaded guilty to one count of murder and had admitted the special circumstances that the murder was committed during the course of a residential burglary and during the course of an attempted robbery. He had admitted to

---

[1]  All further references to statutes are to the Penal Code unless stated otherwise.

[2]  Some of the factual history recited in this opinion is derived from this Court's prior opinion in *People v. Landers, et al.* (Jun. 28, 2011, B218366) (nonpub. opn.). This Court granted respondent's request to take judicial notice of *People v. Landers, et al.*, the case in which Vigeant and his codefendant, Landers, appealed from their convictions. This court also granted respondent's request to take judicial notice of the file in Vigeant's petition for writ of habeas corpus, *In re Vigeant* (Jun. 28, 2011, B231443).

the personal use of a firearm and pleaded guilty to the attempted residential robbery and residential burglary counts. He had not yet been sentenced.

Hernandez had not been offered any deal or plea bargain and had not asked for one. He pleaded guilty to accept responsibility for his actions. He was not offered any leniency for testifying and had volunteered to testify because "the truth needs to be out there, and everybody has a right to the truth." He also wanted to bring justice to the victim's family.

Hernandez was a Marine who had done two tours in Iraq. He was injured when a suicide vehicle exploded near him and shrapnel entered his head. He lost his left eye, his sense of smell, his left frontal lobe, and part of his right frontal lobe. He suffered nerve damage in his right arm and hand. His brain injury affected his thinking and caused him to be more emotional than before, but his ability to feel empathy with others was diminished. He had also become "very compulsive." He did things he normally would not have done, and he sometimes processed information more slowly.

Hernandez met fellow Marine Vigeant at Camp Pendleton Marine Corps Base. Shortly thereafter, he met Vigeant's cousin, Landers, another Marine. At some point, Hernandez talked to them about Iraq and his injuries. Hernandez acknowledged that he did not discuss the emotional or psychological issues related to his injuries with Landers and Vigeant.

Hernandez heard Landers complain about his problems with Pettigrew, whom Hernandez did not know. Landers said that Pettigrew owed him some cocaine, and Vigeant had left his laptop computer with Pettigrew as collateral for the cocaine. Landers believed that Pettigrew was dodging him. Although Pettigrew had told Landers he could pick up the cocaine at Pettigrew's apartment, Pettigrew would "blow [Landers] off" by turning off his cell phone whenever Landers called him.

Hernandez heard Landers and Vigeant threatening Pettigrew over the telephone. During a period of two and one-half hours, Landers and Vigeant left four threatening messages on Pettigrew's voicemail. This occurred on the night of September 7, 2007, and the early morning of September 8, 2007.

3

On the evening of September 9, 2007, Hernandez was drinking with Vigeant and another Marine at the barracks. They then went to a party at someone's house. Landers telephoned Vigeant there and asked Vigeant to pick him up. Vigeant eventually agreed, and Hernandez went with Vigeant so as not to be stranded. When Landers joined them, Landers began complaining again about Pettigrew dodging him. Landers said Pettigrew still had not given him his cocaine, and if he had a gun "he would bust a cap in his ass . . . ."

Hernandez told Landers that he had a handgun, whereupon Landers became "excited, very enthusiastic" and asked Hernandez where the gun was located. Landers wanted to get the gun to shoot Pettigrew. Vigeant also said he wanted Hernandez to get his gun, and he said he wanted Pettigrew to be killed. The only reason that Hernandez went with Landers and Vigeant to Pettigrew's apartment was because Landers and Vigeant were looking for someone with a gun.

Hernandez, Landers, and Vigeant drove to Hernandez's barracks, a 40-minute drive south, and Hernandez retrieved the gun from his car. They then began driving northward to Long Beach. Landers drove, Vigeant was in the front passenger seat, and Hernandez was in the rear seat. At some point during the two-hour drive, Hernandez asked the other men what they wanted him to do, and they said they wanted Pettigrew to be shot. Hernandez told them that there was a difference between being shot and being dead and asked them, "Which one do you want?" Landers said, "I want him dead." Vigeant did not say anything, nor did he say, "No." Hernandez then stated that Landers had the lead role, but Vigeant joined in the response that he wanted the man killed.

As they drove northward, Hernandez fired the gun out the window of the car in the Camp Pendleton area. He asked Landers and Vigeant more than once what they wanted, and they both said they wanted Pettigrew dead. According to Hernandez, "Plan A was to pick up cocaine. Plan B was to kill somebody, which was Mr. Pettigrew." Hernandez did not like the fact that Pettigrew was messing with fellow Marines.

When they arrived at their destination, they all got out of the car and headed to Pettigrew's apartment complex. Hernandez told Landers that if Landers wanted "this

4

guy" dead, and the guy did not give Landers what he wanted, then Hernandez was going to shoot him, "because you said you want him dead, right?" In response, "they were, like, 'Yeah.'" Landers jumped a fence beside Pettigrew's apartment building to check if Pettigrew's window was open. Landers planned to have all three of them hop the fence and enter Pettigrew's apartment through the window, but he returned because "some lady" saw him. Jennifer Potter, who lived next door to Pettigrew, saw a man walking past her window by means of a walkway that was closed off to tenants and the public. When Potter challenged the man, he said he was locked out and was trying to get in his window. Potter believed she heard a gunshot approximately 20 minutes after she saw the man.

Hernandez asked to see a floor plan of Pettigrew's apartment. Landers made one for him out of twigs and small rocks. Hernandez testified that "the plan was always the same: go in, get this guy to give us the coke, and, if not, that he was supposed to get shot."

The three men entered Pettigrew's building, and Landers lightly turned the door knob of Pettigrew's apartment. Hernandez told Landers that the door was not locked and that he could push it open, which he did. Landers entered first, then Vigeant, then Hernandez. Once they had quietly entered the dark apartment, either Landers or Vigeant turned on a lamp. Hernandez then saw Pettigrew, but Landers and Vigeant had already gone through another doorway inside the apartment. Although the two men were being quiet, Hernandez could hear them moving things around.

Hernandez saw that Pettigrew was passed out. Pettigrew awoke and saw Hernandez, whom he did not know. He just looked at Hernandez and said nothing. Landers and Vigeant came back in and saw that Pettigrew was awake. "They were, like, 'Hey, what the fuck? Where is my coke?'" Both Landers and Vigeant were shouting, "Where is the computer. Where is my shit." They began yelling at Pettigrew, demanding the coke.

Hernandez noticed that Pettigrew was "on something." Landers asked Pettigrew if he was on Oxycontin, and Pettigrew said he was. Pettigrew said he would call his

connection and get the coke.  Pettigrew pushed some buttons on his cell phone and Landers's phone rang.  Landers looked at his phone and said, "What the fuck?  . . . [W]hy are you calling me?  Call your dealer."  Landers and Vigeant continued to demand that Pettigrew get the cocaine, and Pettigrew again attempted to make a phone call.  After no more than 20 minutes, Hernandez pulled out his pistol and told Pettigrew he had something that would refresh his memory.  Hernandez jammed the pistol into Pettigrew's right eye socket and said, "You need to make your call.  Call your dealer.  Call whoever you have to call, but get that coke here now."

Pettigrew continued to push buttons on his phone.  Hernandez told him that he would give him 10 seconds.  If Pettigrew had not produced something at the end of those 10 seconds, Hernandez was going to shoot him.  Neither Landers nor Vigeant said anything or attempted to stop Hernandez.  Neither told him to put the gun away.  They continued to yell at Pettigrew saying, "When he starts counting and he gets to 10, when he makes it to 10 he is going to shoot you, so hurry up, get on the phone, call your dealer and get the coke here right now."

Hernandez began counting.  He counted very slowly, waiting approximately 10 or 15 seconds between each number.  When he got to 10, he shot Pettigrew from a distance of approximately four feet.  He did so because that is what Landers and Vigeant had brought him along to do.  He did it to back up his fellow Marines.  At no time during the count did either man say or do anything to register their objection to Hernandez's shooting Pettigrew.  Landers and Vigeant were telling Pettigrew to come up with the stuff or Hernandez would shoot him.

When Hernandez shot Pettigrew, Landers and Vigeant were shocked.  Hernandez believed the shock was not caused by the fact that the shot actually occurred but rather because they were shocked at what they saw—they were not conditioned to see something like that.  They knew they were all there to shoot Pettigrew.  Landers jumped back and said, "Dude, you almost got blood on me."  Vigeant just stood there with his mouth and his eyes wide open.  The three men ran to the car.  Landers drove around

6

aimlessly for about half an hour until Hernandez told him that they needed to get back on the freeway. Vigeant was hysterical. Hernandez explained that, when he said Vigeant was "hysterical," he meant that he was speaking very loudly and saying, "Do you think, he is dead? Do you think he is dead? We should go back." Vigeant wanted to see if the police would show up. He was not crying, and Landers was not crying either.

Hernandez repeated that after he asked Landers and Vigeant if they wanted Pettigrew killed, they both answered "yes." Hernandez asked the same question during the trip between Camp Pendleton and Long Beach, when they got to Long Beach, before they left the barracks, and just before they entered Pettigrew's apartment. Both Landers and Vigeant looked at the gun during the trip, and Vigeant played with it until he was told to stop it. Before the shot was fired, neither Landers nor Vigeant told Hernandez not to do it.

Hernandez said that when he told defense counsel on cross-examination that he did not intend to kill Pettigrew, he meant that he did not want him dead. It was not up to him. He did not even know him. However, he was willing to kill him because Landers and Vigeant had asked him to do so. The rationale was that Pettigrew was messing with Hernandez's fellow Marines. Hernandez acknowledged that he had previously testified that he shot Pettigrew because Hernandez had given Pettigrew a specific order and Pettigrew had not obeyed it.

After the shooting, the three men drove back to Camp Pendleton, stopping on the way for food at a convenience store. They went to Landers's room and talked about the shooting. They agreed not to say anything and to pretend they did not know each other. They drank and "hung out" for about three more hours. Landers told Hernandez he should have shot Pettigrew two more times to ensure he was dead.

On the day after the shooting, September 10, 2007, Mauricio Rosales, a maintenance man, noticed an apartment door ajar in Pettigrew's building. When he looked inside, he saw a man slumped down on the sofa with a cell phone in his right hand. The man was bloody and was not breathing. Rosales called 911.

7

Police officers responded to the scene. A nine-millimeter casing and an expended round were collected in the apartment. Dr. Raffi Djabourian, a deputy medical examiner, testified that Pettigrew had a bullet entrance wound at the left temple that exited on the back of the head. The wound was rapidly fatal. The victim was found still holding his cell phone due to a rapid onset of rigor. None of the various drugs found in his system contributed to his death.

Detective Scott Lasch was assigned to the Pettigrew murder case along with Detective Malcolm Evans. They did not find any narcotics or drug-dealing paraphernalia in Pettigrew's apartment. They found a laptop computer that was registered to Vigeant on the rear seat of Pettigrew's truck. Detective Lasch discovered that a parking citation was issued to Vigeant on September 6, 2007 (three days before the shooting), in the area of Orizaba Avenue in Long Beach, near Pettigrew's apartment.

By means of Pettigrew's cell phone records, the investigating officers established that calls were made from Landers's and Vigeant's cell phones to Pettigrew on the night of his death and two days before his death. Two days before the shooting, Vigeant said: "Hey what's up brotha. I know you know who this is. It's fuckin' Tony. And dude, fuckin', eh-heh, if you don't stop playing games, it's gonna get ugly dude. And, fuckin', I'm gonna come to your house. And it's gonna be all bad. So hit me back, ASAP. Late." Fifty-three minutes later, Vigeant left the following message: "Dave you better fuckin' hit me back right now dude. Fuckin', me and my cousin, we ain't playin' dude. You fuckin' hit us back up or I'll fuckin' find your ass dude. Hit me up. Late."

In between Vigeant's two messages, Landers left a message stating, "Hey Dave, you better fuckin' call me back bro." Shortly after midnight, on September 8, 2007, Vigeant left the following message: "Dave, don't even play dude. Fuckin', me and my b-me and my homeboy Tre, fuckin', are ready to rumble dude. Fuckin, pick up your phone dude or it's gonna get ugly. Just to let you know. Nobody fuckin' robs me dude. No one. So, it's in your best interest to pick up your phone, otherwise it's gonna get really ugly, and we know where to find you. Not only at your apartment, but we got

8

fuckin' military fuckin' aspect. Fuckin', we know where to look man. You're fucked if you try to run. Alright . . . . Hit me up. See if I'm playing. Late."

Detective Bryan McMahon investigated cell site hits for telephones linked to Landers and Vigeant. He discovered that the hits on the cell sites during the evening of Pettigrew's death began near Camp Pendleton and proceeded north along the coast, the No. 5 freeway, the No. 22 freeway, and all the way to Long Beach. A cluster of hits at a certain point led the investigators to go to that location, and they located a gas station near that spot. The investigators obtained footage from the gas station's security cameras that showed Vigeant, Landers, and Hernandez pulling up to the pumps at 8:40 p.m. They all got out of the car. Vigeant is seen talking on his cell phone, and Landers also used his cell phone. The footage showed Landers driving away from the gas station at 8:51 p.m.

Detective Dennis Robbins assisted in the investigation of Pettigrew's murder. After Landers was arrested in the Bay Area by United States Marshalls, Detective Robbins interviewed Landers in the Contra Costa County jail on September 27. When shown a photograph of his cousin, Vigeant, Landers said he did not know him. Landers said he did not know Hernandez when shown a photograph of him. Landers said he had not been in Long Beach in the preceding weeks. Landers acknowledged that he was due back at Camp Pendleton on September 24, 2007, and had failed to show up. He said it was because he had been scheduled to go to Iraq on September 28, and he did not want to go.

Detective McMahon testified that he made a series of phone calls to Vigeant on September 23, 2007, between 4:32 p.m. and 6:45 p.m. Not all of the calls were answered. An audio recording of the calls was played for the jury. Vigeant exchanged pleasantries with the detective, beginning with "How's it going man?" when the detective introduced himself. When asked if he knew anybody that had recently been murdered down in Long Beach, Vigeant merely replied, "Negative." When told that the "guy's" name was David and asked if the name rang a bell, Vigeant said "Yes." When Detective McMahon then asked "What's that?," Vigeant said he had left his laptop "down there." He said David was his cousin's friend. He then said his cousin, named Trevor Landers,

9

had met David a couple of times. Vigeant said he lent Pettigrew the laptop "a couple of months" earlier. Vigeant denied several times having spoken to Pettigrew on his phone just after midnight on September 8, 2007. He said he had never been to Pettigrew's home in Long Beach. Vigeant said that Landers knew Pettigrew from school. When the detective asked Vigeant how he could be contacted, Vigeant replied that he had just moved into his barracks two weeks earlier and was not sure the detective could contact him there. When asked again about phone calls to Pettigrew, Vigeant claimed he had lent his phone to a friend named Hernandez, but Hernandez did not know Pettigrew. Vigeant had not seen Pettigrew in "probably like a month." Vigeant expressed no curiosity when the detective stated that he was trying to figure out what happened to Pettigrew. Vigeant merely replied, "Yeah." When the detective told Vigeant that Pettigrew was murdered, Vigeant expressed surprise.

Vigeant told the detective that he had gone to a going-away party at the home of a Corporal Schrader on September 8, 2007, a Saturday. He was at the party from 4:00 or 5:00 until 1:00 or 2:00 the next morning. He then said he called Pettigrew from the party to ask for his laptop. In a subsequent phone call, Detective McMahon clarified to Vigeant that the murder took place on Sunday, September 9. Vigeant said he was alone that day, "just chilling."

Detective McMahon interviewed Hernandez on September 28, 2007. Hernandez initially denied going to Long Beach. After being told that another suspect was in custody, Hernandez related the events on the night of the murder. An audio recording of Hernandez's interview was played for the jury.

Detective McMahon retrieved Hernandez's gun from a location in Tempe, Arizona, where Hernandez had directed him to look. The gun was a Browning high-power nine-millimeter weapon (People's exhibit 20). Troy Ward, a criminalist with the Long Beach Police Department, confirmed that Hernandez's firearm matched the shell casing found at the scene of Pettigrew's shooting.

10

## I. New Trial Motion

### A. *Vigeant's Argument*

Vigeant contends that the trial court erroneously denied his motion for new trial on the grounds of ineffective assistance of counsel. According to Vigeant, his trial counsel, David R. Cohn, was aware of Vigeant's mental disabilities and was therefore obligated to investigate them, consult an expert, and introduce expert testimony on the nature of Vigeant's neurodevelopmental disabilities. Cohn's failure to do so resulted in a denial of Vigeant's rights under the Sixth and Fourteenth Amendments. Cohn was also ineffective for failing to investigate Hernandez's disabilities and consult an expert to prepare for Hernandez's cross-examination and testify as necessary.

### B. *Relevant Authority*

Ineffective assistance of counsel, if proven, is a valid, nonstatutory ground for a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583; *People v. Reed* (2010) 183 Cal.App.4th 1137, 1143.) Upon appeal from the denial of a new trial motion based on a claim of ineffective assistance or other denial of constitutional rights, we apply two distinct standards of review. We defer to the trial court's factual findings if supported by substantial evidence, but we exercise de novo review over the ultimate issue of whether Vigeant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

On appeal, to establish ineffective assistance of counsel, a defendant has the burden of proving both that "his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659-660; see also *Strickland v. Washington* (1984) 466 U.S. 668, 686-687 (*Strickland*).) "A defendant must prove prejudice that is a '"demonstrable reality," not simply speculation.' [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) A court need not assess

the two factors of the inquiry in order. If there is an inadequate showing on either factor, it need not be addressed. (*Strickland*, at p. 697.)

In examining claims of ineffective assistance of counsel, we give great deference to counsel's reasonable tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) A defendant must establish that the challenged act or omission did not result from an informed tactical choice within the range of reasonable competence. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) In order to establish ineffective assistance based on an alleged failure to investigate, a defendant "must prove that counsel failed to make particular investigations and that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious defense." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257.) At the same time, any tactical choices regarding the preparation of the case and the focus of the investigation in one area rather than another must be reasonable under prevailing professional norms. (*Wiggins v. Smith* (2003) 539 U.S. 510, 521-522.)

"'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" (*Id*. at p. 521.) Appellate courts must refrain from second-guessing trial counsel, since "'[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" (*Id*. at pp. 521-522.)

With respect to a claim that counsel has withdrawn a defense, our Supreme Court has stated: "'It is sufficient for the present purpose to observe that the defense was potentially meritorious, and that petitioner was denied an adjudication on the matter because of his counsel's inadequate factual and legal preparation.'" (*People v. Shaw* (1984) 35 Cal.3d 535, 541.) A crucial defense is not necessarily one that would result inexorably in a defendant's acquittal. (*Ibid*.)

12

## C. *Proceedings Below*

In the instant case, after denying the motion for an evidentiary hearing, the trial court noted that it had reviewed the request for a new trial. At the trial court's invitation, defense counsel for the new trial motion, Gregorio Roman, addressed the court, stating that Vigeant was seeking new trial on three grounds: ineffective assistance of counsel, insufficiency of the evidence, and newly discovered evidence consisting of a letter written by Hernandez. Roman stated there was clearly a failure to investigate Vigeant's and Hernandez's psychological disabilities, although trial counsel, Cohn, was aware of them. With respect to Vigeant, Cohn did not investigate his attention deficit disorder or his auditory deficit. As support for this contention, Roman cited the report by Dr. Harvey E. Dondershine and the affidavit of James D. Gregory, a California attorney. This lack of investigation precluded labeling Cohn's act or failure to act a tactical decision or strategic choice. If Cohn had properly investigated, "he would have known that this mental deficit would have risen to a possible defense," and the result would probably have been different.

With respect to Hernandez, Roman argued, Cohn failed to obtain his medical records. These records showed Hernandez suffered from many psychiatric disorders. Cohn also failed to look into Hernandez's seizure disorder. If the neurological and neuropsychological findings had been uncovered by Cohn and presented to the jury, they would have affected the jury's assessment of the issue of intent, leading to a different result.

In denying the motion, the trial court cited salient portions of the evidence against Vigeant and found it sufficient. The court found that the letter from Hernandez that was claimed to be newly discovered evidence was not evidence—merely a letter in which Hernandez accepted responsibility, which he had done at trial. As for ineffective assistance of counsel, the court stated that "[a]ll the things that is contained in defendant's moving paper is simply conclusionary and it would have made, in this court's opinion, no difference in results. Therefore, motion for new trial is denied."

13

### D. New Trial Motion Properly Denied

Vigeant's argument on appeal focuses on the alleged ineffective assistance of trial counsel. The essence of Vigeant's argument is that Cohn was aware of Vigeant's mental deficits, and the prevailing professional norms obligated him to investigate these deficits, consult an expert, and introduce expert testimony on the nature of Vigeant's neurodevelopmental disabilities.

At the close of the trial of Vigeant and Landers, the trial court held a *Marsden*[3] hearing when Vigeant said he no longer wished to be represented by Cohn, his retained counsel. At the hearing, Vigeant voiced a multitude of complaints, among them that Cohn did not acknowledge or address Vigeant's medical issues in the context of Vigeant's ability to understand the trial proceedings. Vigeant said he had "ADD" and "auditor processing disorder." Cohn responded that he had never received any indication from Vigeant that Vigeant did not understand what Cohn was telling him, what the charges and their consequences were, and what the defenses were. Vigeant's mother had told him that her son had ADD, but Cohn never saw any evidence of it and did not see any problems with Vigeant's understanding or communicating with him about the case. Cohn stated he did not see how "the medical issue" was going to help Vigeant's case in any way during the trial "from a strategic defense standpoint." Cohn had not had any difficulty communicating with Vigeant during jail visits or court sessions. Cohn had not had any problems at all in preparing a defense because of any intellectual, mental or emotional disabilities that Vigeant had.

The trial court denied Vigeant's request to fire Cohn, and Cohn went on to represent Vigeant at sentencing. The trial court's refusal to allow Vigeant to fire Cohn resulted in a remand for resentencing on appeal.

Vigeant also filed a petition for writ of habeas corpus on the ground that he was denied effective assistance of counsel due to Cohn's failure to investigate Vigeant's

---

[3]    *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*.)

mental disabilities and retain an expert and his failure to investigate Hernandez's disabilities—the same grounds on which he later sought a new trial. The record from Vigeant's petition for writ of habeas corpus shows that Cohn was informed of Vigeant's medical history by Vigeant's mother, Joanne Scheer. Scheer declared that she advised Cohn that Vigeant had ADD and an auditory processing disability. She expressed her concerns in the context of Vigeant's being able to understand what was being said in the courtroom and by Cohn. Scheer stated that she provided Cohn with (1) copies of records from the Bay Area Research Institute, (2) Vigeant's high school individualized education plan (IEP), (3) a report from Children's Hospital in Oakland, California, and (4) an audiological evaluation obtained through the John Muir Medical Center. Her stated purpose was for Cohn to take steps to help Vigeant's understanding at trial. Cohn acknowledged receipt of the information and told Scheer that Vigeant seemed to understand Cohn.

The records Scheer mailed to Cohn are contained in Exhibit E of Vigeant's habeas corpus petition. Vigeant's 10th grade IEP merely states that Vigeant had an auditory processing disability, had been diagnosed with ADD, and recommended a plan of action. The evaluation obtained through the John Muir Medical Center was performed when Vigeant was six and a half years old. The evaluation noted multiple weak areas in Vigeant's central auditory processing system either due to developmental delay or some innate factor.

The audiological evaluation from the Children's Hospital in Oakland took place when Vigeant was eight years old. The report stated that Vigeant had exhibited auditory processing difficulties for linguistic information, but his extremely short attention span could have confounded the test results. It was recommended that he undergo a speech and language evaluation. The records note that Vigeant had a very short attention span.

The Bay Area Research Institute records are from 2003 through 2004, when Vigeant was 16 and 17 years old, and they document Vigeant's participation in a pharmaceutical clinical trial. The classification of "markedly ill" for Vigeant was based on symptoms reported by Vigeant and his mother. Dr. Kathleen Toups, who conducted

the clinical trial, wrote a letter in 2009 (after the verdicts in Vigeant's trial were returned) stating that attention deficit hyperactivity disorder (ADHD) causes deficits in executive functioning and that the impairment is not generally outgrown. This letter states that Vigeant had a "high level of functional impairment" due to ADHD. As we have noted, however, the record indicates that Vigeant's symptoms were self-reported. The records consist mainly of a chronology of Vigeant's use of study medication, which appears to have been beneficial.

Considering the totality of the information Cohn received, we cannot conclude that trial counsel was ineffective in not investigating Vigeant's impairments further. "[I]f the record does not preclude a satisfactory explanation for counsel's actions, we will not, on appeal, find that trial counsel acted deficiently." (*People v. Stewart* (2004) 33 Cal.4th 425, 459.) Competent counsel, when presented with information that a client was diagnosed in childhood with a central auditory processing deficit and ADD or ADHD and that the client had participated in a clinical trial at the ages of 16 and 17, could reasonably conclude that his impairments would not rise to the level of a viable defense. As Cohn informed the trial court, he had met with Vigeant 20 to 25 times. He had gone over discovery with Vigeant and discussed his version of events and defenses with him. Furthermore, after high school Vigeant was accepted into the Marine Corps at the age of 19 and was four months short of his 21st birthday when the instant crimes were committed.

As for Hernandez's mental deficits, the jury heard Hernandez describe the extent of his brain injuries and the effects the injuries had on him. At trial, Cohn cross-examined Hernandez about the inconsistencies in his trial testimony and his former statements with respect to his and the defendants' intent on the night of the murder, as well as Vigeant's actions and attitude on the night of the shooting. He also pointed out these inconsistencies to the jury during argument. He discussed Hernandez's injuries and their effect on him as a factor in his unreliable testimony about Vigeant and as the sole motive for his shooting Pettigrew. Counsel made appropriate use of Hernandez's

16

injuries, and we do not believe he was ineffective in not obtaining Hernandez's medical records and in not hiring an expert to analyze them.

We do not agree with Vigeant's assertion that Cohn's actions do not merit being considered a tactical decision due to his failure to investigate Vigeant's medical history. In the declaration of Attorney James D. Gregory, which is essentially the same in the habeas petition (Exhibit D) and the new trial motion, Gregory offers his opinion that an attorney is unqualified to make a determination whether his client suffers from a mental disorder, and Cohn failed to recognize the evidentiary significance of Vigeant's disability and understand how it provided a potential meritorious defense to the charged offenses. Likewise, Dr. Dondershine expressed the opinion that trial counsel's failure to hire an expert meant that he failed to understand the relevance of the medical records to the issue of legal intent, and he was unable to assess the weight to be given the medical evidence in planning his defense strategy. The records Cohn received from Scheer do not support these opinions. The information provided to Cohn indicated that Vigeant went untreated for any mental disorder between the ages of eight and 17. Vigeant then participated in a clinical trial for approximately seven months and did not seek to continue medication after the clinical trial ended. He was then able to graduate from high school and join the Marine Corps. "A decision not to pursue testimony by a psychiatric expert, when no mental state defense seems likely, is not unreasonable under *Strickland*. [Citation.]" (*Wilson v. Henry* (9th Cir. 1999) 185 F.3d 986, 990.)

Given the strong presumption that Cohn's decision was reasonable and the deference paid to counsel's tactical decisions, "[a]n assessment of counsel's performance does not include the distorting effects of hindsight, but rather evaluates such at the time of the claimed errors and in light of all the circumstances. [Citation.]" (*People v. Adkins* (2002) 103 Cal.App.4th 942, 950.) Reasonable counsel might question the merits of a defense based on a disorder for which Vigeant sought no treatment. This was evident from the medical records. Cohn did not need the aid of an expert to appreciate their significance or lack thereof, especially since Vigeant exhibited no symptoms in his dealings with counsel.

17

Moreover, Vigeant cannot show he suffered prejudice from a failure to consult experts to investigate Vigeant's and Hernandez's medical and psychiatric issues. Vigeant contends he suffered prejudice because, had the jury been able to view his participation in the crimes in the light of his neuropsychiatric deficits, and had it been presented with a medical reason to question the reliability of Hernandez's testimony, it is reasonably probable it would have rejected the prosecutor's argument that Vigeant was a full and equal participant. It would have rejected the idea that he had the required specific intent in the charged offenses, or it would have determined that the People failed to prove intent beyond a reasonable doubt. At the very least, he asserts, it is reasonably probable the jury would have determined that the People failed to prove the special circumstances.

With respect to Vigeant, when examining prejudice in the context of ineffective assistance of counsel claims based on a duty to investigate, we also look to the strength of the evidence. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (*Strickland*, *supra*, 466 U.S. at p. 696.) In our previous opinion in case No. B218366, we set out the evidence against Vigeant and rejected his argument that Hernandez's testimony provided the only evidence of Vigeant's intent, and that the inconsistency of this testimony and insufficient corroboration resulted in a mere suspicion of Vigeant's guilt. Also, Vigeant's telephone calls with Detective McMahon provided substantial evidence that Vigeant was fully capable of understanding what was said to him, even over the telephone. These conversations also showed he was capable of imparting false and evasive information when asked about his connection with Pettigrew. It is not likely that the jury would have been persuaded that Vigeant did not fully appreciate the events in which he participated on the night of the shooting if it had been informed that Vigeant had been treated in his youth for ADHD and an auditory processing disorder.

The additional examination of Vigeant by Dr. Timothy Collister, a psychologist, does little to bolster the notion that Vigeant was prejudiced by Cohn's failure to investigate. Dr. Collister wrote a report after examining Vigeant in preparation for the new trial motion. This report is contained as Exhibit H in the written motion. Dr.

18

Collister cites Dr. Toups's generalized comments about what ADHD *can* cause as part of the basis for his recommending a neuropsychological evaluation of Vigeant prior to the hearing on the new trial motion. Dr. Collister also stated that he believed Vigeant's condition had remained stable over time. Dr. Collister believed this indicated Vigeant's conditions were "experienced" at the time of the crime. As we have pointed out, Vigeant had managed to finish high school and become a Marine during this period of stability. Given the fact that Vigeant received little treatment for his conditions throughout his life and the fact that he was able to function with these deficits, it is not reasonably probable that a jury would have found Vigeant lacked the required intent at the time of the offenses due to his conditions.

With respect to Hernandez, his medical records, as provided in the new trial motion, do not add significantly to what he himself testified to, at least in the context of the instant crimes. As noted, Hernandez himself testified at trial about his disabilities due to his brain injury. Hernandez said he lost a third of his brain, which included the frontal left lobe and a part of the frontal right lobe. When asked how his injuries affected him in terms of his mental abilities, Hernandez said he was very compulsive and tended to do things he normally would not do. He was also very emotional. He processed information more slowly, and he had less empathy for others. He said he was very dependent on alcohol and could not remember when certain conversations with the defendants took place. He acknowledged it was difficult for him to recall what was said by the defendants on the night of the shooting. Reasonable counsel could have determined that Hernandez's testimony sufficiently exposed his limitations as a witness to the jury, especially since Hernandez took responsibility for the shooting.

Hernandez's medical records reveal little regarding any mental deficits he may have suffered from as a result of the injury to his head. Most of the entries involve his rehabilitation after his injury and various physical problems, unrelated to his injury, that he suffered over the years since 2004. A report of a neuropsychological evaluation in October 2004 states that Hernandez had intact perceptual and spatial skills, language, attention, learning, and auditory memory ability. Hernandez exhibited extremely strong

19

skills in his ability to recall a general fund of information and in visual memory ability. Cognitive flexibility was somewhat weak but deemed likely to improve. This evidence would have given the prosecutor a strong counterpoint to any defense expert testimony about Hernandez's defects. This evidence, combined with Hernandez's demeanor and frankness before the jury, leaves little possibility that his testimony at the trial of Vigeant and Landers would have been discredited to a greater degree than it already was. Furthermore, as we explained in our opinion in Vigeant's and Landers's appeals, Hernandez's testimony was substantially corroborated by independent evidence. (*People v. Landers*, *supra*, B218366.)

We "'reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 980.) In cases where a defendant claims that defense counsel should have presented particular evidence, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland*, *supra*, 466 U.S. at p. 689.) "[E]ven 'debatable trial tactics' do not 'constitute a deprivation of the effective assistance of counsel.' [Citations.]" (*People v. Miller* (1972) 7 Cal.3d 562, 573-574.)

20

On this record, we believe counsel's actions were reasoned tactical decisions, and Vigeant has failed to affirmatively show prejudice. Any presumed error on the part of Cohn in failing to investigate Vigeant's and Hernandez's mental deficits is insufficient to undermine confidence in the outcome of the trial. The trial court did not err in denying Vigeant's motion for new trial, and Vigeant suffered no violation of his rights under the Sixth and Fourteenth Amendments.

## II. Lack of Evidentiary Hearing and Refusal to Appoint a Clinical Neuropsychologist

### A. *Vigeant's Argument*

Vigeant contends that the trial court abused its discretion by refusing to hold an evidentiary hearing on his new trial motion and refusing to appoint a clinical neuropsychologist to examine him and give an opinion about his mental deficits. According to Vigeant, such an expert opinion was necessary to establish his ineffective assistance of counsel claim. Separately or cumulatively, these errors denied him his rights to counsel, due process, equal protection, and the right to presentation of a defense. Vigeant asserts that reversal is necessary because it is impossible to measure the effect of the testimony he would have presented had he been able to subpoena trial counsel and retain a neuropsychologist to examine him and to testify at an evidentiary hearing.

### B. *Relevant Authority*

"There is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony." (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal. 4th 394, 414.) "California law affords numerous examples of a trial court's authority, in ruling upon motions, to resolve evidentiary disputes without resorting to live testimony." (See *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 201, and authority cited therein.)

Evidence Code section 730 provides in pertinent part: "When it appears to the court, at any time *before or during the trial of an action*, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on

motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. . . . ." (Italics added.) "Evidence Code section 730 provides for appointment of ancillary services at public expense for indigent criminal defendants in noncapital cases only for purposes of defense at trial on the issue of guilt." (*People v. Stuckey* (2009) 175 Cal.App.4th 898, 908.) "On appeal, a trial court's order on a motion for ancillary services is reviewed for abuse of discretion. [Citations]." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1085, overruled on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151; see also *Ake v. Oklahoma* (1985) 470 U.S. 68, 77; *Stuckey*, at p. 916.)

### C. Proceedings Below

After reviewing the parties' briefs and hearing argument regarding the need to hold an evidentiary hearing, the trial court denied the request. The court stated, "At this time, I am going to rule that the court will exercise discretion, deny motion to have an evidentiary hearing as to whether or not there was a ineffective assistance of counsel. But I did allow both parties to submit written brief as to why a new trial should be granted, and I also have reviewed your request as to why the court should grant a motion for new trial.

### D. No Abuse of Discretion or Error

Vigeant contends that a hearing was necessary to resolve material disputed issues of fact and to allow him the opportunity to establish he was prejudiced by counsel's failure to investigate and consult and retain experts. He adds that the denial of an evidentiary hearing violated his right to due process. Vigeant acknowledges that, although there is no case law requiring a trial court to hold an evidentiary hearing when a new trial motion is based on ineffective assistance of counsel, a trial court has the discretion to hold such a hearing when the new trial is sought on the grounds of jury misconduct. (See, e.g., *People v. Hedgecock* (1990) 51 Cal.3d 395, 415.) Vigeant urges that the court must have the same discretion to hold a hearing to resolve material disputed issues relating to ineffective assistance of counsel.

22

We agree that the trial court had this discretion, but we conclude that the court did not abuse its discretion. *People v. Williams* (1997) 16 Cal.4th 635 is instructive on this point. In that case, the defendant moved for a new trial, alleging jury misconduct and presenting the declarations of three jurors who stated that the jury never reached a verdict on the murder charges even though there were signed verdict forms. (*Id*. at p. 685.) The trial court did not find the declarations credible and denied the motion without holding an evidentiary hearing. (*Id*. at pp. 685-686.) The reviewing court found no "manifest and unmistakable abuse in discretion" and stated that the trial court could resolve any disputed factual issue without need for an evidentiary hearing. (*Id*. at p. 686.)

The same is true in the instant case and is even more evident. The trial court had heard all the evidence during trial and had had the opportunity to observe trial counsel and Vigeant in the courtroom. The new trial motion had many exhibits in support of Vigeant's claim of ineffective assistance. Cohn had the opportunity to explain his actions during the posttrial *Marsden* hearing, as discussed *ante*. Thus, the material facts in this case were adequately explained by the voluminous information before the court, combined with its own observations. The matter was fully capable of being resolved on the record, and no evidentiary hearing was necessary. Given the great degree of latitude accorded the trial court in these matters, there was no abuse of discretion. (*People v. Williams*, *supra*, 16 Cal.4th at p. 686; *People v. Dennis* (1986) 177 Cal.App.3d 863, 873 [A defendant seeking a new trial must "establish, by affidavit, oral testimony *or* reference to the trial record, that his trial counsel was ineffective in some manner and that counsel's ineffectiveness prejudiced him." (Italics added.)])

We also conclude the trial court did not err by refusing to appoint the neuropsychiatric expert that Vigeant requested. Even if there was error, Vigeant suffered no prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [error in the admission or exclusion of evidence warrants reversal of a judgment only if an examination of "'the entire cause, including the evidence,'" discloses the error produced a "'miscarriage of justice'"]; *People v. Breverman* (1998) 19 Cal.4th 142, 173.) It has been held that "Evidence Code section 730 does not authorize the appointment of experts after trial in

connection with sentencing proceedings. Nor do the federal or state Constitutions entitle an indigent criminal defendant to improve his chances of a favorable sentencing choice by having experts echo the arguments of defense counsel." (*Stuckey*, *supra*, 175 Cal.App.4th at p. 905.)

Vigeant argues that *Stuckey* applies narrowly to sentencing proceedings as occurred in that case but not in the context of a new trial motion, and Vigeant faults respondent for failing to respond to this argument. We believe it is not necessary to determine the breadth of *Stuckey*'s holding, since in the instant case, Vigeant suffered no prejudice from the lack of another expert opinion, even one from a different type of specialist. Such evidence would have been cumulative and of insignificant benefit given the abundance of information on Vigeant's mental deficits in the record, including two reports by experts. The issue before the court was clearly presented on the affidavits and the results of tests already performed. There was no reasonable probability that there would have been a different result had the trial court allowed Vigeant to consult a neuropsychiatrist to further refine the details of his impairments for the court. There was no abuse of discretion and no violation of Vigeant's constitutional rights.

## III. Cruel and Unusual Punishment

### A. *Vigeant's Argument*

According to Vigeant, when his involvement in the instant crimes is viewed in light of his neuropsychiatric deficits, his moral culpability is not that of a depraved killer. Therefore, his LWOP sentence amounts to cruel and unusual punishment under the state and federal Constitutions.

### B. *Proceedings Below*

On April 30, 2012, Vigeant filed a motion to strike the special circumstance as cruel and unusual punishment under *People v. Dillon* (1983) 34 Cal.3d 441, 488-489 (defendant's crime reduced to second degree murder after his immaturity, lack of criminal history, and character were taken into account in determining he did not foresee the risk he was creating) Vigeant relied on the assertion that the nature of the offense and the offender showed that an LWOP sentence was disproportionate to his crime. Vigeant

24

attached his social history, supporting documents, character letters, Dr. Collister's psychological evaluation, and other exhibits to the motion.  Over the prosecutor's objection, the trial court allowed Vigeant to present several witnesses in support of the motion in addition to argument.

In denying the motion, the trial court stated, "Defendant has demonstrated nothing pursuant to Penal Code section 1385.1 that defendant's sentence would be cruel and unusual.  I have heard lots of testimony pursuant to the court's discretion to allow defense to present some mitigating factors as to why the court should strike the enhancement allegation, special circumstances allegation.  And one of the arguments that you make is that defendant should be granted a mercy by the court.  David Pettigrew never got mercy from anybody.  He was shot, executed.  And Mr. Vigeant was not a minor player, he made calls.  He was there the night before[4] and he was there during the actual killing of Mr. Pettigrew.  There is nothing in the evidence that indicates that Mr. Vigeant was simply there and that his role was minor, at best."

### C.  Relevant Authority

Defining crime and determining punishment are matters uniquely legislative in nature, and courts will not question the validity of legislatively enacted punishments unless their "'''"unconstitutionality clearly, positively, and unmistakably appears."'''" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 569.)  "'Reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.' [Citations.]  'Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. [Citations.]' [Citation.]" (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1213–1214 [rejecting cruel and unusual punishment challenge to § 12022.53, subd. (d)].)  Because a defendant must overcome a

---

[4]    The evidence showed Vigeant received a parking ticket near Pettigrew's apartment three days before the murder.

25

"'considerable burden'" to show his sentence is disproportionate to his level of culpability, findings of disproportionality have occurred with "'exquisite rarity in the case law.'" (*People v. Em* (2009) 171 Cal.App.4th 964, 972.)

To succeed on a challenge under the cruel or unusual punishment provision of the California Constitution, the defendant must show that the punishment is so disproportionate that it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).) A reviewing court must examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society; compare the challenged punishment to punishments for more serious crimes in the same jurisdiction; and compare such challenged penalty with the punishments prescribed for the same offense in other jurisdictions having a similar constitutional provision. (*Lynch*, at pp. 425-427.)

Under the federal Constitution, "three factors may be relevant to a determination of whether a sentence is so disproportionate that it violates the Eighth Amendment: '(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.'" (*Ewing v. California* (2003) 538 U.S. 11, 22.)

### D. *No Cruel and/or Unusual Punishment*

Vigeant's motion and his appeal rest on the first *Lynch* factor—the nature of the offender and the offense. Vigeant focuses on his mental deficits and contends they made him significantly less culpable than the typical offender. Because of his disabilities, he argues, he was more susceptible to peer pressure and was unable to comprehend and foresee the consequences. His participation was inconsistent with his character, which does not reflect dangerousness or a proclivity to violence.[5] Therefore, the punishment imposed does not fit the criminal.

---

[5] Vigeant submitted a report by Amy York, a forensic social worker and member of the National Association of Sentencing Advocates and Mitigation Specialists. The trial court was also provided with many letters attesting to Vigeant's good character, trusting

We agree that Vigeant's nature as attested to by his friends and family is not that of a vicious killer. Vigeant displayed a different nature, however, on the night of the shooting, as evidenced by Hernandez's testimony and Vigeant's telephone calls to the victim. Vigeant showed he could be aggressive. Even if he was following along with his cousin, he made a choice to do so. Vigeant played with the gun on the long drive to Pettigrew's apartment, and he agreed that Pettigrew should be killed if he did not comply. He participated in shouting at Pettigrew, increasing the tension in those crucial moments when Hernandez held a gun to Pettigrew's head and counted down the last seconds of Pettigrew's life. Vigeant displayed a heedless and heartless nature throughout Pettigrew's ordeal, as well as a capacity for violence, which was also evident in his telephone messages to Pettigrew. The circumstances of the crime showed that Vigeant was capable of fully participating in the cruel act of terrifying a victim with a gun to his head and doing nothing to discourage the shooter from carrying out his threat. The cases cited by Vigeant, which relate to defendants who were juveniles or mentally retarded, do not aid his cause. (See, e.g., *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455]; *Graham v. Florida* (2010) 560 U.S. 48; *Roper v. Simmons* (2005) 543 U.S. 551; *Atkins v. Virginia* (2002) 536 U.S. 304; *People v. Caballero* (2012) 55 Cal.4th 262, 268.)

Vigeant makes no showing on the second and third *Lynch* factors, which require the comparison of Vigeant's punishment with punishments in California for more serious crimes and the punishment imposed with punishments in other states. Because Vigeant makes no representations on these factors, we do not consider them.

In sum, we do not find Vigeant's punishment to be out of all proportion with the offenses and so disproportionate as to "shock[] the conscience and offend[] fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424; *People v. Meneses* (2011) 193 Cal.App.4th 1087, 1094.)

---

personality, his nature as a follower who is easily manipulated, and his susceptibility to acting on impulse.

With respect to the federal standard for finding a sentence to be cruel and unusual, a three-part analysis to determine whether a sentence was disproportionate to a crime was set out in *Solem v. Helm* (1983) 463 U.S. 277. *Solem*'s test did not retain the support of a majority of the Supreme Court in *Harmelin v. Michigan* (1991) 501 U.S. 957. In that case, Justice Scalia, joined by Chief Justice Rehnquist, concluded *Solem* was wrongly decided and that the Eighth Amendment does not guarantee proportionality of sentences. (*Harmelin v. Michigan*, at p. 965.) Justice Kennedy, joined by Justices O'Connor and Souter, concluded that the Eighth Amendment prohibits only sentences that are "'grossly disproportionate' to the crime." (*Id.* at p. 1001 (conc. opn. of Kennedy, J.).) Justice Kennedy noted that ""'[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [are] exceedingly rare."'" (*Ibid*.)

The federal gross proportionality test is similar to, and accepts the same analysis as, the first technique in the three-part test of *Lynch*. In *Harmelin v. Michigan*, the United States Supreme Court upheld a sentence of life without possibility of parole for the defendant's first felony offense of possession of 672 grams of cocaine. (501 U.S. at p. 961.) Vigeant's crime was a violent felony that resulted in the death of a young man. His sentence is not grossly disproportionate, nor is it "disproportionate to the defendant's personal responsibility and moral guilt." (*People v. Marshall* (1990) 50 Cal.3d 907, 938.) His lack of a criminal history and his mental deficiencies are outweighed by the gravity of the offense and the circumstances surrounding its commission. Therefore, the sentence is not cruel and unusual under the California or federal Constitutions.

## IV. Section 654 and Count 2

### A. Proceedings Below

After denying Vigeant's new trial motion, the trial court imposed the same sentence it had imposed after trial. For the first degree murder with special circumstances in count 1 (murder committed during the commission of residential burglary and attempted robbery), the court imposed life without the possibility of parole. For the attempted home invasion robbery in count 2, the court imposed 54 months to be

served consecutively with an additional consecutive year for the principal-armed enhancement under section 12022, subdivision (a)(1). The trial court stayed the sentence for the burglary in count 3 under section 654.

### B. Vigeant's Argument

Vigeant contends that the trial court was required by section 654 to stay the term imposed in count 2 for attempted robbery, just as it did with the burglary count. He argues that the attempted robbery count is indivisible from the special circumstance of murder in the commission of an attempted robbery. The same evidence that established the substantive offenses of burglary and attempted robbery also established the burglary and attempted robbery special circumstances.

### B. Relevant Authority

Penal Code section 654 provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 protects against multiple punishment rather than multiple conviction. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) A defendant thus may not be punished for two separate crimes which arise either out of a single act or out of an indivisible transaction. The indivisibility or divisibility of criminal conduct depends upon whether the defendant has a single or separate criminal objectives. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208; *Harrison*, at p. 335.) That is, "if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*Harrison*, at p. 335.)

If, on the other hand, "the [defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

Whether multiple convictions were part of an indivisible transaction is primarily a question of fact. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583.) We review such a finding under the substantial evidence test. We consider the evidence in the light most favorable to the People and presume the existence of every fact the trier could reasonably deduce from the evidence. (*Ibid.*; see *People v. Osband* (1996) 13 Cal.4th 622, 730.)

### C. Separate Punishment Warranted

We conclude that substantial evidence supported the trial court's implied finding that Vigeant held separate objectives in the attempted robbery of Pettigrew and in the murder. At the sentencing of Vigeant's codefendant, Landers, on August 3, 2009, the court heard argument on the issue of whether the sentences in counts 2 and 3, attempted robbery and residential burglary, respectively, should be stayed under section 654.[6] The prosecutor argued that section 654 applied only to the residential burglary count. Landers's counsel argued that both the burglary and attempted robbery sentences had to be stayed because the jury had the option to convict the defendants of felony murder, and there was no indication which theory or theories of murder the verdict rested upon. In sentencing Landers, the trial court imposed a consecutive sentence in count 2, stating, "I don't find that there is 654, because 654 is designed to not—to make sure that the defendant is not punished for the same crime. However, this is not the same crime, because you don't necessarily need to have committed robbery to commit a murder." The trial court ultimately sentenced Vigeant to the same sentence as Landers.

Although the trial court's finding was inartfully phrased, it is clear that it made an implied finding that Vigeant, as well as Landers, held a separate intent and objective in committing the attempted robbery. We observe that the attempted robbery was a separate and distinct crime preceding the murder by as much as 20 minutes, according to Hernandez. Therefore, the trial court legitimately could have decided on the facts before it that a separate sentence was proper.

---

**6**     Vigeant's sentencing was continued due to Cohn's unavailability and because Vigeant expressed his desire to fire Cohn and obtain appointed counsel.

Even if Vigeant's offenses are seen as a continuous course of conduct, however, the crimes he committed are not indivisible. In *People v. Harrison*, *supra*, 48 Cal.3d at page 335, our Supreme Court explained in connection with section 654, subdivision (a): "[B]ecause the statute is intended to ensure that defendant is punished 'commensurate with his culpability' [citation], its protection has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.' [Citation.] [¶] It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible."

In *People v. Osband*, *supra*, 13 Cal.4th 622, for example, the trial court imposed consecutive sentences for the rape and robbery of one of Osband's victims. The victim was stabbed to death and raped, and cash and other items were taken from her home. (*Id*. at pp. 653-654.) Osband was found guilty of murder, burglary, robbery, and forcible rape. The jury found true three special-circumstance allegations, including the circumstance that the murder was committed during a robbery and after raping the victim. (*Id*. at pp. 652-653.) Osband claimed, inter alia, that the court erred under state law (§ 654) in imposing consecutive sentences for the rape and robbery because the crimes were committed for a single objective. (*Osband*, at p. 730.) The People responded that there was no question of a single objective, since the court sentenced Osband on the rape and robbery and therefore implicitly found that the crimes involved more than one objective. (*Ibid*.) The People asserted this was a factual determination that had to be sustained on appeal if supported by substantial evidence. The California Supreme Court agreed with the People that substantial evidence sustained the court's implicit determination that Osband held more than one objective when he committed the crimes. The court declined to stay any portion of the sentence on section 654 grounds. (*Osband*, at pp. 730-731.)

Vigeant's claim also fails under the reasoning of *People v. Cleveland* (2001) 87 Cal.App.4th 263. In that case, Cleveland was seen beating an elderly man with a two-by-four piece of wood inside the man's apartment. The witness saw Cleveland leaving the victim's apartment carrying the victim's Walkman radio. Cleveland was arrested and

eventually convicted of attempted murder, robbery, and assault with a deadly weapon. (*Id*. at p. 267.) Cleveland argued on appeal that his robbery sentence should have been stayed under section 654 because the robbery and attempted murder occurred during an indivisible course of conduct pursuant to the sole objective of robbing the victim. (*Cleveland*, at p. 268.) In addition to reiterating that a defendant may be punished for each violation committed in pursuit of each separate objective even though the violations were parts of an otherwise indivisible course of conduct (*id*. at pp. 267-268), the court added that "[a]s the court in *People v. Nguyen* (1988) 204 Cal.App.3d 181, 191, observed: 'at some point the means to achieve an objective may become so extreme they can no longer be termed "incidental" and must be considered to express a different and more sinister goal than mere successful commission of the original crime. . . . [¶] . . . [¶] . . . [S]ection [654] cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense.'" (*Id*. at p. 272.) Likewise, in the instant case, Vigeant's aiding and abetting of the murder of Pettigrew cannot be seen as part and parcel of the goal to rob him. Vigeant's sentence on count 2 stands.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.


32